## COOK v. MORAN TOWING & TRANSP. CO.

### (District Court, S. D. New York. April 5, 1911.)

COLLISION (§ 77*)—TOW AND DRIFTING LAUNCH—FAILURE TO KEEP LOOKOUT.
   A tug returning to New York from the sea about daylight in the morn-
   ing, with two dump scows on hawsers, passed within from 50 to 150 feet
   of a disabled motor launch containing eight persons who shouted and
   waved their handkerchiefs, but were apparently not seen, and one of
   the scows struck and overturned the launch, three of the occupants being
   drowned, while the others, including libelant, were rescued by other
   vessels.  *Held*, on the evidence, that the tug was in fault and liable for
   the collision for failing to have a lookout forward where one, if atten-
   tive to his duty, would have seen the launch.

   [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 140–149; Dec.
   Dig. § 77.*

   Collision with or between towing vessels and vessels in tow, see note
   to Nielson v. Northern Pac. Ry. Co., 100 C. C. A. 581.]

In Admiralty. Suit in personam by Mabelle B. Cook against the
Moran Towing & Transportation Company, owners of the tug Julia C.
Moran. Decree for libelant.

Hunt, Hill & Betts (George Whitefield Betts, Jr., and Robert Mc-
Leod Jackson, of counsel), for libelant.

Frank Verner Johnson (William L. O'Brion, of counsel), for re-
spondent.

HOLT, District Judge. This is an action in personam to recover
damages for personal injuries sustained by the libelant by reason of a
collision between a motor launch and a scow, alleged to have been
caused by the negligence of the tug Julia C. Moran, owned by the re-
spondent, which was towing the scow. On the evening of September
14, 1906, the libelant Mabelle B. Cook was a member of a pleasure
party of eight, consisting of four men and four women, who, after
dining at a hotel at Sheepshead Bay, embarked about 9 o'clock on a
motor launch, owned by one of the men of the party, intending to go
to Rockaway Beach, and there take the train to return to New York.
The owner of the launch had invited the rest of the party to take the
trip. The launch was about 20 feet long, 5 feet beam, and drew about
18 inches of water. She had a 4 horse power gasoline engine. Her
freeboard was about three and a half feet. She was decked over for-
ward, for a short distance aft of the stem, and on the sides, but had no
cabin, and was substantially an open launch. She had on board no
lights, whistle, foghorn, or apparatus of any kind for showing a light
or making a noise. The trip the party intended to take from Sheeps-
head Bay to Rockaway Beach was about five or six miles in length, on
shallow waters, protected from the ocean by Rockaway Beach. After
the launch had been out about half an hour, the engine became out of
order and stopped. Efforts to repair it were made, but they were un-
successful. A brisk breeze from the northeast sprang up. The launch
had a small anchor, to which a rope was attached; it was thrown over,
but in a short time the rope broke. Some boards were removed from

the bottom with which the men tried to paddle ashore, but the tide was so strong that they could not accomplish anything. Thereafter the boat drifted through the night, under the influence of the northeast wind, down into the lower bay, and near dawn the boat was in a position above the Romer Shoal and not far above the West Bank Light. At that time the tug Julia C. Moran, towing two empty dumper scows, came up the bay, heading for the Narrows. The first scow was on a hawser 200 fathoms in length, and the second scow trailing behind on another hawser of 85 fathoms, making a total flotilla of more than a third of a mile in length. The tug passed to leeward of the launch. The wind at that time was blowing a stiff breeze, causing a choppy sea. The witnesses from the launch estimate the distance of the tug, when she passed the launch, at from 50 to 150 feet. They testify that several in the launch stood up, waved handkerchiefs and shouted for help, and that a man in the pilot house of the tug opened the window and waved his arm in a backward direction, as though warning them to keep away from the tow. All the men on the tug deny that any one looked out of the window, or saw the launch at all. The tug passed on without stopping. The witnesses from the launch testify that about the time she passed she changed her course to starboard, and some of them assert that if that had not taken place the collision would not have occurred. The witnesses from the tug all testify that there was no change of course of the tug at that place; that from the time she passed the Romer Shoal Light she was headed straight for the Narrows. The tug passed on, and the launch drifted down and came in collision with the front of the last scow, with the result that the launch was tipped over, and all its occupants thrown into the water. Three of them, two women and a man, were drowned. Two of the men and Miss Cook, the libelant, reached the overturned launch, and clung to it, and another man clung to a tool chest which floated from the launch. Later the steamer El Paso, coming up the bay, heard cries for help, saw the people in the water, and put out a boat to rescue them. About the same time, the tug McCaldin Bros. came down the bay, and the El Paso whistled to them to help. The boat from the El Paso saved the man on the tool chest, and the McCaldin Bros. rescued the three on the launch. The other woman of the party was saved in an extraordinary manner. The scow which collided with the launch had gates or doors in the bottom, by which its load was dumped. They had been opened for that purpose at the dumping ground below Scotland Light, and were left open. When the collision occurred, the woman in question went under the scow, and on coming to the surface found herself inside the scow. She clung to a chain fastened along the side of the scow. When the tug reached the Narrows, about half an hour later, her crew proceeded to shorten the hawser as usual, for the purpose of taking the tow through the Narrows on a short hawser, and then discovered the woman in the scow. She was thereupon rescued and brought to New York. The witnesses from the launch who have testified all fix the time which they were in the water at about an hour, but I think in fact they were in the water about 25 or 30 minutes. Miss Cook, when rescued, was almost unconscious; the men with her

on the launch had lashed a rope to her and held her up, but the waves had frequently gone over her. The McCaldin Bros. took the rescued persons to the Marine Hospital, and it was some hours before Miss Cook regained much consciousness. The Marine Hospital having no women attendants, she was removed that afternoon to the infirmary on Staten Island, and the next day to her rooms in New York. She was under medical attendance for about a fortnight, during which time she was in great danger of pneumonia. She suffered much during all that time from pain and nervousness. At the end of about a fortnight, she went to Boston, and thereafter lived there with her mother. She was practically unable to do any work for about a year, being in a weak, nervous, and anemic condition. She had a large number of abscesses, one of which was so serious as to require her being taken to a hospital for an operation, where she remained about a fortnight. About September, 1907, she undertook to resume work in her trade as a milliner; but for a long time could not work but a few days at a time. Her health, however, has steadily improved, and she has now substantially recovered.

The only claim of fault in this case is that the tug did not take suitable means to avoid running down the launch with the scow. The substantial question in the case is whether the lookout on the tug was negligent in not seeing the launch. If, as the witnesses on the launch assert, some one on the tug did see the launch, and failed to prevent its collision with the tow or to rescue its occupants from their dangerous situation, I have no hesitation in saying that the tug should be held for the consequences of the collision. The question, therefore, is whether it was light enough, when the tug passed the launch, for the launch to be seen by a lookout on the tug attending properly to his duty. As all the witnesses on the tug assert that they knew nothing about the collision, none of them has given any direct evidence fixing the time when it occurred. The evidence upon which the respondent relies as to the time of the collision is the evidence of the officers of the steamship El Paso and the tug McCaldin Bros. as to the time of the rescue, and the evidence as to the time when the tug Moran reached the Narrows, from which an attempt is made to compute the time of the collision. The evidence of the officers of the El Paso, which is supported by the entries in the log, is that they left Scotland Light at 4:45, that about 5:30 the captain on the bridge heard a cry for help, that it was still quite dark, and that it took him several minutes to locate the man floating on the tool chest, and several minutes more to discover the three people clinging to the launch. The captain of the McCaldin Bros. testified that it was breaking day when he was hailed by the El Paso. The record kept by an official at the Narrows of the arrival and departure of tugs with tows at that place states that the Moran arrived there that morning at 5:40. The point where the libelant and the others were rescued was perhaps an eighth of a mile above the West Bank Light, and the distance from that point to the Narrows is about four miles. The tide was about the end of the flood. I think that the place of rescue was not far from the place of collision. What tide there was would tend to send them up towards

the Narrows, and the brisk northeast breeze would tend to send them down away from the Narrows. I think that the influence of the wind would more than counteract the influence of the tide, and that the point of collision was somewhat northeast of the point of rescue. But I do not believe that they floated very far before they were rescued. The witnesses who were rescued testify that they were in the water about an hour, but they would naturally much exaggerate the time passed while awaiting rescue in such a dangerous situation. The difficulty which the officers of the El Paso had in seeing the people in the water, when they first heard their cries for help, does not seem to me very weighty proof of the darkness. The rescue was certainly but a few minutes before sunrise. Probably only the heads of the persons in the water were visible, and the surface of the water was made rough by the wind. On the other hand, of the five persons rescued, four testified, being the four that were rescued by the McCaldin Bros. and the boat from the El Paso. They all testify positively that before and at the time of the collision the daylight was sufficient to enable them to see objects at a long distance. They all say that they saw the tug coming a long distance away; that the night had been a clear night, and that they had seen the Coney Island lights all night, and that for some time before the collision they had become dim and substantially ceased to be visible, and the shore line and objects on the shore were visible. Three watches carried by members of the party stopped about 5:15. Upon the whole evidence, my conclusion is that the collision took place between 5:10 and 5:15; that is to say, less than half an hour before sunrise, which occurred at 5:36. The weather reports show that it was a clear morning. The choppy sea raised by the brisk wind undoubtedly would have some tendency to prevent a small boat from being seen, but this boat had a freeboard of 3½ feet, and was filled with eight people, who, as they passed the tug, were waving handkerchiefs, shouting and making every effort in their power to attract the attention of the men on the tug. It is possible that they were seen from the tug, and that the man who saw them, supposing that their boat was under control, waved to them a warning to keep away from the scows, but all on board the tug deny that they knew anything about the accident, and my conclusion is, upon the whole evidence, that they did not, and that the man who was seen, by the persons on the launch, at the pilot house window of the tug did not see them. But in view of all the evidence in the case, although the question must be admitted to be a close one, I am of the opinion that if the tug had had a proper lookout, attending to his duty, he would have seen the launch. There was no lookout forward. The officers claimed that the wind was so heavy that morning that spray constantly dashed over the stem of the tug, and that the pilot house was a better place for a lookout than the bow. I do not think so. A little spray may have occasionally broken over the bow, but I do not think it was heavy enough or constant enough to justify the tug in not having a lookout forward. There was a man in the pilot house with the captain. If he had been on the deck forward he would have been more likely to see the launch

against the sky line than in his position in the pilot house. The pilot house windows to windward were closed. The probability is that, noticing no lights, they assumed that there was no vessel in the vicinity. It was perhaps not to be expected that any such launch would be out in such a place at such an hour in the morning. But it is the fundamental duty of all vessels under way, and especially of a vessel under way in a crowded harbor, to keep a lookout in the best place of observation, constantly alert and attentive to his duty, and vessels should be held strictly accountable for the performance of that duty.

My conclusion is that the men on the tug were at fault for not seeing the launch when they passed her, and that the libelant is therefore entitled to recover in this case. I think that she should recover the following amounts:

| | |
|---|---:|
| Loss of wages for one year, at $10 a week | $ 520 00 |
| 6 months' time lost while employed in Boston as a milliner, at $18 a week | 432 00 |
| Personal effects lost and destroyed | 187 00 |
| Paid for medicines | 100 00 |
| Hospital expenses in Boston | 52 50 |
| Medical attendance, other than Dr. Gay | 150 00 |
| Dr. Gay's bill | 454 00 |
| Pain and suffering, the result of the accident | 2,000 00 |
| | $3,895 50 |

My conclusion is that the libelant should have judgment against the respondent for $3,895.50, with costs.